Filed 10/20/21  P. v. Avignone CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM ALAN AVIGNONE et al.,<br><br>    Defendants and Appellants. | D075948<br><br><br>(Super. Ct. No. SCD250640)<br><br>ORDER MODIFYING OPINION AND DENYING MOTION TO FILE A LATE PETITION FOR REHEARING AS MOOT<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on September 30, 2021, be modified as follows:

1.    On page 2, in the second line of the first full paragraph the space after the word "Georgia" is removed.

2.    On page 62, the first sentence after the heading "The Existence of Two Tests to Determine If an Instrument Is a Security Did Not Violate Susan's Equal Protection Rights" is removed and replaced with:

> Susan, with William joining, argues that because the
> existence of a security is determined using two tests—the

risk capital and *Howey* tests—her equal protection rights were violated.

There is no change in judgment.

The motion to file a late petition for rehearing is denied as moot.

McCONNELL, P. J.

Copies to: All parties

Filed 9/30/21  P. v. Avignone CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM ALAN AVIGNONE et al.,<br><br>    Defendants and Appellants. | D075948<br><br><br>(Super. Ct. No. SCD250640) |


APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant William Alan Avignone.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant Susan Joy Avignone.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

William and Susan Avignone solicited funds for a real estate investment scheme in Georgia , promising their inexperienced, and naïve investors regular interest payments at high rates of interest and the return of all principal plus large profits.  The Avignones told their victims the investment was guaranteed, safe and that their principal was not at risk.  Several investors were also promised first lien positions on the properties.  Through their company, SABA Investments, William and Susan did purchase several homes in Georgia.  However, most of the money they were entrusted with was used for personal expenses.  In the end, the pair spent most of the money, filed for bankruptcy, and closed their business without repaying hundreds of thousands of dollars lent to them by the victims.

An initial guilty plea by both defendants was withdrawn after this court determined their sentences were unlawful.  Eventually the pair was brought to trial and Susan and William were each convicted of six counts of grand theft and nine counts of securities fraud.  The jury also found true white collar crime enhancements.  William was sentenced to 13 years in state prison and Susan was sentenced to seven years in state prison.  Both now appeal their judgments of conviction on various grounds.

William challenges his conviction on multiple bases and Susan joins each of these arguments.  First, William asserts the six grand theft convictions should be consolidated into one conviction as a matter of law in accordance with *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*).  Alternatively, William argues the court's failure to give a jury instruction based on *Bailey* was error.  William next argues the trial court erred by failing to give a unanimity instruction requiring the jury to agree that the basis for each theft conviction was either false pretenses or embezzlement.  William also asserts that the court prejudicially erred by giving a conspiracy instruction, which

2

allowed the jury to improperly convict based on conspiracy to commit a negligent act, a legal impossibility.  Similarly, William argues that the instructions on the excessive takings enhancement under Penal Code section 186.11 constituted error because they allowed the computation of losses to include securities fraud and theft by false pretenses.  William also challenges the trial court's jurisdiction over the crimes related to victims who resided in Arizona.  Finally, William argues there was insufficient evidence to support the jury's findings that the promissory notes used to complete the fraud were securities.

Susan also challenges the sufficiency of the evidence to support her securities fraud convictions, arguing there was no evidence she personally made, aided or abetted, or conspired to make any false statement or omission of material fact.  She also challenges the sufficiency of the evidence to support the jury's finding that the false statement and omissions were material.  Finally, Susan asserts her equal protection rights were violated because California law allows two alternative tests to determine whether a transaction is a security.

As we shall explain, we reject the Avignones' arguments and affirm the judgments of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

*A. The Prosecution's Case*

William and Susan were financial advisors specializing in variable life insurance products when they opened their own firm, SABA Financial, in 2006.  William stated he did not like the way his prior employer, World Financial Group, did business, so he decided to strike out on his own.  In 2009, William was introduced to Mark Evans.  William attended a seminar put on by Evans, who impressed William with his expertise in a method of

3

real estate investment using private investments, backed by promissory notes, to purchase properties to rent to tenants eligible for assistance from the federal housing voucher program known as Section 8. William partnered with another financial advisor he met at the seminar to purchase Evans's business model for $18,000.

Using Evans's method, William planned to obtain cash from his clients and in exchange write them promissory notes. William and Susan then planned to purchase "undervalued" properties in Atlanta, Georgia (using Evans's contacts) to refurbish and rent to Section 8 tenants. The scheme included promises to the investors of first lien positions on properties, giving clients peace of mind that their investments were secure. William testified that he believed he could give himself and his investors a great return using Evans's plan. William and Susan quickly began soliciting funds for their new scheme, looking to their unsophisticated life insurance clients.

*1. Eric Van De Ven*

William and Susan's first investors in the real estate scheme were existing clients Eric and Kristen Van De Ven, who resided in Topock, Arizona. In 2006, the Van De Vens were introduced to the Avignones by Susan's brother, who was the pastor at the church the Van De Vens attended. Eric Van De Ven is a drywall contractor who dropped out of school in tenth grade. After their initial meetings, the Van De Vens were persuaded by William and Susan to complete a cash-out refinance of their home. The Van De Vens' monthly mortgage payments were just $355 per month, and Eric expressed concern to Susan that he could not afford a higher payment. Kristen also did not think refinancing their home was a good idea.

Susan told the Van De Vens that Eric could use the proceeds of the refinance to start his own business, which would increase his income and

4

support the higher monthly mortgage payments. Eric was eventually persuaded and with Susan completing the paperwork, the couple took $125,000 in equity from their home. Their mortgage payment increased to $1,200 per month. The Van De Vens used the money to pay off debt, purchase tools for Eric's business, and on the Avignones' advice, deposit $75,000 into an "ING Account." On William's recommendation, the Van De Vens then each invested $12,500 from the ING Account into two Midland National life insurance policies. The Van De Vens made another $12,500 investment into each policy the following year.

In 2009, William contacted Eric by phone and told him about the new real estate investment opportunity. William told Eric the new opportunity would provide higher returns than the Midland National policy. The money would be invested in property in Georgia, and the Van De Vens could expect a 10% rate of return, and quarterly interest payments of $675 for five years. The properties would then be sold at a profit, and the Van De Vens would receive back 50% of that profit. William also told Eric they would have a first lien position on the property, which Eric interpreted to mean he had an ownership interest in the property that would provide security and control, and the ability to liquidate his position before five years. William also told Eric he could get his money back whenever he needed it.

An email Willian sent to Eric after their phone call to solicit the investment, explained the money would be used to purchase "a highly discounted, refurbished and guaranteed rented house and you get 1/2 equity position on any profits beyond your initial investment. You are NOT having to deal with being the 'landlord' on any of these properties. The system is already in place to take care of all that. You will just get a periodic check without any worries of the day-to-day task of managing the properties."

5

The Van De Vens agreed to the investment, and on the Avignones' advice and with William and Susan's assistance, withdrew $27,000 from their Midland National life insurance policies. The Van De Vens received two checks from Midland, which they deposited into their checking account. The Van De Vens then wrote SABA Financial a check for $27,000 and mailed it to the Avignones' offices in San Diego. After receiving the check, in April 2009, William emailed Eric a promissory note, which the Van De Vens printed, signed, and faxed back to William. The note stated the Van De Vens would receive the promised quarterly payments of $675, 50% of the profits on the sale of property above $50,000, and a first lien position on the property. The Van De Vens never received any paperwork showing a lien.

The Van De Vens received three to five payments, then in early 2011 the payments stopped. Eric, whose work had slowed and needed the monthly payments to cover his higher mortgage and other living expenses, repeatedly called and emailed the Avignones. William told Eric to relax and that if the Van De Vens wanted their principal returned he should submit a formal letter to SABA. The Van De Vens sent a notarized letter requesting the money, but the request went unanswered. On June 1, 2011, Eric sent an email to the Avignones threatening legal action if their money was not returned. William responded by email, telling Eric to take responsibility for his actions, and not "throw 'blame' or hurl accusations and threats somewhere they don't belong." The email stated the Van De Vens would receive their money back, but it never came.

*2. Otilia Branch*

The Avignones' next victim was Otilia Branch, an administrator for the health company Kaiser. Branch, who had been with Kaiser for 40 years, was nearing retirement when her friend Beverly White recommended Branch

6

meet with the Avignones.[1] Branch had a meeting with William and Susan sometime in 2006, and on their recommendation invested in a Midland National life insurance policy. As with the Van De Vens, the Avignones advised Branch to refinance her house and use a portion of the equity to purchase life insurance.

In June 2009, Branch met with the Avignones and White. William and Susan evaluated Branch's financial position and prepared an investment strategy recommending she use the proceeds of her retirement accounts from Kaiser to invest in the real estate scheme. The Avignones suggested Branch invest in five properties in Georgia at a cost of $50,000 each. William and Susan explained to Branch that the investment was secure and that she would receive quarterly interest payments based on an annual interest rate of 12%. They also told Branch she would have a first lien position on the properties, which were to be purchased, refurbished, and used for Section 8 housing. They emphasized the principal investment was secure because of the lien and guaranteed Branch that she would not lose her principal investment. Branch relied on the Avignones to take care of her retirement funds and she believed the investment was safe and would provide her with regular income to subsidize her social security payments.

The Avignones also told Branch the properties would be sold in three to five years, and the investors would receive half of the profit above the initial $50,000, which they estimated would be $150,000. During the meeting, the

---

[1] Branch was White's supervisor at Kaiser for a time in 1995. White left Kaiser, but remained friends with Branch. White met William and Susan in 2005 when she began working as an independent contractor for World Financial Group. White was starting her career in insurance sales and considered the Avignones mentors. When William and Susan left World Financial Group to start SABA, White brought her insurance business to SABA.

Avignones gave Branch a "Special Report" they had prepared, which stated the investment was safe and secure, and that it would provide a high yield return. The "Report" did not explain specifically what the investment was, or any risks it carried, rather it highlighted the secure nature of the investment, its liquidity, and the above market rates of return that were available, promising clients a "Turnkey 9% Secured Investment."

William suggested that Branch withdraw funds from her Midland National life insurance policy to fund the first property purchase. William and Susan completed the paperwork required for the withdrawal. On June 15, 2009, Branch wrote a check to SABA Investments for $70,000. Branch testified at trial that $70,000 was the maximum amount that could be withdrawn from her life insurance policy, and William advised her it made sense to invest the most possible in the real estate scheme. The Avignones gave Branch a $70,000 promissory note, dated June 15, 2009. The note stated interest would accrue at a rate of 12% per year and that Branch would receive quarterly payments of $2,100 for five years.[2]

Branch retired in December 2009, and the following month, William and Susan provided Branch with a document outlining their plans for her retirement finances. The document indicated SABA would pay the premiums on Branch's Midland National life insurance policy, and recommended Branch invest an additional $280,000 in the real estate scheme. The document also stated that Branch's principal investment "will never be at

_____

[2] Another promissory note for $50,000, signed by Branch on June 11, 2010, with an interest rate of 16.8% was allegedly a replacement for the $70,000 note so that $20,000 could be returned to the Midland National life insurance policy. Neither Branch nor White could recall any specifics about the replacement note, but Branch believed that the $20,000 that the Avignones represented would be returned to the insurance policy was never deposited and that the policy lapsed.

risk," and would be returned to her or renegotiated in three to five years or sooner. As with the earlier investment, William and Susan promised quarterly interest payments at a rate of 12% per year.

Branch took the advice, liquidated her retirement account and at the Avignones' direction gave a check for $249,000 to a holding company called Entrust. In return, Branch received another promissory note, this one for $245,000 with an interest rate of 12% per year. Branch believed she would have a first lien position on the properties that were to be purchased with her investment, but that was not stated on the promissory note. On June 20, 2010, Branch wired additional funds from her 401(k) retirement account to Entrust, and received a new promissory note for $285,000, replacing the $245,000 note.

Branch and White believed that with the $285,000 investment and the prior $70,000, the Avignones would purchase seven houses for $50,000 each and that Branch would be the first lienholder on each property.[3] Branch also thought paperwork would be prepared, in addition to the promissory notes, that would reflect the liens. She never received any documentation, however, showing she had a lien on any property. When Branch asked, with White's assistance, for the documentation she was promised, William said that things were delayed, or that they were on vacation, or that they encountered illness. In May 2010, Branch asked William for copies of her paperwork to make sure he had repaid the Midland policy and showing the policy was reinstated and in effect, but Branch never received it.

---

[3]    White's agreement with the Avignones was a $5,000 referral fee for each property they purchased using funds from a client White referred to them.

Branch did receive quarterly interest payments, $2,100 for the first note and $8,400 for the second, until early 2011. After her payments stopped, in early March 2011, Branch sent William a heated email requesting information about her investments. She asserted that her Midland National life insurance policy had lapsed because of his and Susan's failure to pay the premiums and sought confirmation of her liens and equity positions in the Georgia properties they had allegedly purchased with her investment. William sent an email in response, stating that he was exercising the option to terminate the note and that he would repay the principal. No money was returned to Branch. She called and emailed repeatedly, and eventually realized that the SABA offices had been closed. Branch hired an attorney and filed a lawsuit against the defendants in 2012. The Avignones settled the lawsuit with Branch in 2014 for a sum certain (not disclosed in this case) and the transfer of several properties to Branch.

*3. Monroe Wightman*

The Avignones's third victim, Monroe Wightman, was also connected to White.[4] Wightman, a retired ship engineer, was White's next door neighbor. She introduced him to William and Susan in 2009, and Wightman purchased a life insurance policy from SABA Financial. Shortly after, Wightman received an inheritance and was looking for an investment vehicle for the money. White told Wightman about the Avignones' real estate scheme and set up another meeting between them. William and Susan told Wightman about their investment in Georgia property that would be used for Section 8 housing. They told Wightman the houses cost $50,000, they would earn

---

[4] Wightman knew White as Beverly Russel. The record does not make clear why White used two different surnames.

money from guaranteed rental income, and the income would go towards the quarterly interest payments promised at a rate of 12% per year.

As with the other investors, the Avignones told Wightman the properties would be sold at a profit after three to five years and Wightman would be a first lien holder and entitled to 50% of the profits above the $50,000 purchase price. The Avignones provided Wightman with the same "Special Report" given to Branch that represented the investment was safe and secured, yet still offered a "high yield." Wightman trusted White and the Avignones. William guaranteed the investment would be profitable.

Wightman agreed to invest $150,000. Wightman received two promissory notes, the first dated June 16, 2009 for $100,000 and a second dated June 23, 2009 for $50,000. The notes indicated that Wightman was a first lien holder. Over the next two years, Wightman received 13 or 14 of the promised interest payments, each by check signed by Susan for SABA Investments. Wightman never received any additional documentation showing his position as a first lienholder on any property.

The payments ceased around March 2011. When Wightman inquired, William gave Wightman various excuses. He first told Wightman the checks were delayed and would be forthcoming. William later told Wightman that a property manager had stolen the profits, been caught, and the money was tied up in court proceedings. William then told Wightman, in an email dated April 28, 2012, that he and Susan were being investigated. Wightman was contacted and interviewed by an investigator for the district attorney's office shortly after.

*4. Carlos Lopez*

Carlos Lopez was a colleague of Branch. Lopez worked with Branch at Kaiser for over 20 years, primarily as a Spanish interpreter. Their

11

retirements were close in time, and Branch referred Lopez to the Avignones to help with his retirement investments. Lopez trusted Branch's advice and met with Susan and William at their La Mesa office in 2009. Lopez gave the Avignones information about his finances and investment needs. After the meeting, he agreed to take their advice and invest in the same real estate scheme that William and Susan recommended for Branch. William and Susan explained to Lopez that they planned to purchase properties in Georgia, rent the homes, and then eventually sell them at a profit. As he had with the other investors, William advised Lopez he would receive regular interest payments at a rate of 12% per year.

After his retirement in November 2009, Lopez gave the Avignones a check for $217,000, the entire proceeds of his retirement account. The Avignones delivered the check to Entrust. Susan assisted Lopez in negotiating settlements with a few creditors and used approximately $13,000 to pay off Lopez's existing debt. On January 27, 2010, Lopez received a promissory note for $200,000. The note stated Lopez would receive quarterly interest payments of $6,000 for five years. The note did not state that Lopez would have a first lien on any property and Lopez did not recall being told that he would be given a lien.

After signing the note, Lopez received monthly payments of $2,000 for about eighteen months. When the payments stopped, Lopez called the Avignones' office. When he did not get a response, he visited the office and found it had been closed. Lopez recalled that when he finally reached the Avignones they gave him various excuses about the stopped payments. They initially said the payments were delayed because of an illness in the family, then Susan told Lopez the money "was taken away," and finally that they had lost a large amount of money on the investments in Georgia. In the end,

12

Lopez received nothing from the Avignones beyond the monthly payments that ceased in 2011. Like Branch, Lopez lost his entire retirement.

### 5. *Frank Blowers*

Frank Blowers met William and Susan at his church in a program called "Entrepeneuring For Christ." The Avignones presented to the group about life insurance as a retirement investment. After the presentation, Blowers met with William and Susan at their office in La Mesa to discuss life insurance. When he got there, the Avignones told Blowers they had a better opportunity for him. They told Blowers they had a successful real estate company that flipped houses into rentals. They also said they could offer better returns than what Blowers had currently, paying him 10% on his investment.

According to Blowers, both William and Susan participated in this presentation. They emphasized the investment was safe and secure because the properties could always be sold. William told Blowers he personally guaranteed that Blowers would not lose money on the investment. Blowers felt he could trust the Avignones because they had been invited to present at his church. They showed Blowers photographs of homes they intended to purchase in Georgia and a nice home there they stated they owned. The Avignones also told Blowers the scheme was already profitable.

Blowers was attracted to the investment because it offered regular payments. Blowers was retired and recently divorced, and was looking for additional income to support his monthly housing costs. On May 6, 2010, Blowers invested his life savings, $54,000, from his retirement account with the Avignones. He provided a check to Entrust and received a promissory note from the Avignones in exchange. The note stated that Blowers would receive quarterly interest payments of $1,350 based on an annual interest

13

rate of 10% for five years. Thereafter, Blowers received monthly payments of $450. The payments ended after eight months.

Blowers remained close with William and Susan after his investment, seeing them weekly at church and often having lunch with them after. Blowers went to a birthday party for William during this time period, and was the only non-family member in attendance. In April 2011, before the payments to Blowers ceased, Blowers invested an additional $20,000 with the Avignones. The Avignones told Blowers they needed additional funds to complete the renovations of one of the investment properties. Blowers sold a tractor and other equipment, and gave the cash proceeds to William and Susan. In exchange, Blowers received a second promissory note, dated April 15, 2011, stating he would receive $750 in interest after four months.

Shortly after this second investment, Blowers received a payment that was short, then the payments stopped entirely. Blowers immediately contacted William and Susan, who told him that their accounts had been illegally seized and they were working on straightening things out. Blowers never received any further payment.

6. *Forensic Accounting*

A key witness at trial, in addition to the testifying victims, was the district attorney's forensic accountant, Kevin Boyne. Boyne analyzed the defendants' bank records from April 2009 to April 2012, the point all of the investors' contributions—totaling $806,000—had been depleted. Boyne established that the Avignones purchased 11 homes in Georgia at a total cost of $190,000. He then traced the portions of the funds from each investment to SABA by the victims that could be substantiated with records.

Boyne showed that of the $27,000 invested by the Van De Vens, $16,780.38 was wired to a financial intermediary in Georgia for the purchase

14

of 740 S. Grand Avenue, $14 was charged for the wire fee, and $6,000 was used to pay contractors for work on that property.

For Branch, Boyne showed that after her first $70,000 transfer to the Avignones, they withdrew $8,000 in cash or as a cashier's check, and spent $7,998.50 on personal expenses that included interest on personal loans, personal credit card debt payments, payment to their Welk Resort time share, and payments to a personal line of credit. $24,942.69 was directed towards the purchase of real estate and $3,618.17 went towards business related expenses. $675 of Branch's initial $70,000 investment went towards an interest payment to the Van De Vens, and $14,000 was paid to White.

Boyne also traced Branch's second and third transfers to the Avignones, of $245,000 on February 11, 2010 and $40,000 on June 16, 2010. Boyne showed a portion of those funds were used to make interest payments to Branch herself, Van De Ven, Wightman, Lopez, Blowers, and another investor. $6,711 was withdrawn in cash and $87,447.95 went towards personal expenses, including life insurance premiums on policies that listed Susan as the beneficiary, credit card payments, payment on a personal line of credit, an IRS payment, the Welk Resort time share, boat repairs, and Costco and other consumer stores. Of the $285,000, Boyne calculated $105,878.23 was used to purchase real estate and real estate related expenses, and an additional $66,000 was used for business expenses, including the Avignones' office lease, utilities, and attendance at sales seminars.

With respect to Wightman's $150,000 investment, Boyne opined that the Avignones spent $43,755.56 on personal expenses, including mortgage payments for a second home in Alaska, restaurants, retail shopping, credit card debt, their home mortgage, donations to their church, personal

insurance, and boat repairs. They used a little over half, $75,995.51 on real estate and related business expenses.

Boyne determined that Blowers's and Lopez's investments were comingled into one bank account, so he evaluated the funds together, tracing the money from February 3, 2010, when Lopez's check for $200,000 was deposited, continuing through May 11, 2010, when Blowers's $54,000 was deposited, and ending on December 29, 2010, when the account was almost entirely depleted. Boyne found the Avignones used $137,990.82 for personal expenditures, including car payments and gasoline purchases; dental payments; credit card payments; $30,085.87 for their home mortgage, gas, utilities, and property taxes; and San Diego restaurants. The account was also used to pay $1,500 in interest to Wightman, and $4,423.57 in interest to Branch.

A real estate attorney evaluated the chain of title for the 11 properties purchased by the Avignones and found no property had a lien in favor of any of the victims. Boyne also determined the Avignones had spent between $54,000 and $55,000 on repairs for the properties and made interest payments to the victims totaling $133,875. By Boyne's calculations, the Avignones embezzled between $425,000 and $560,000 from their victims.

*7. Bankruptcy Proceedings*

In 2012, William and Susan filed for Chapter 13 bankruptcy. In their filings, they failed to list any of the investors as creditors and none of them were notified of the proceedings. They listed SABA Financial as a dissolved entity with a value of $0. They also listed the Georgia properties as assets. Before any plan was put in place in the bankruptcy, the Avignones voluntarily dismissed their bankruptcy petition.

16

In 2014, appellants filed for Chapter 7 bankruptcy. They listed unsecured debt of $1,271,580.80. At a hearing in the proceeding, William testified they sold two Georgia properties in 2013. One property was sold for $121,500, and resulted in net proceeds of $48,175. The other property had net proceeds of $53,769.55. William testified the money was all gone, and it was used for appellants' legal fees, for living expenses, and to take care of other properties that were in arrears to avoid foreclosure.

B. *Defense Case*

Susan called an Atlanta-based consultant the Avignones hired to assist in their efforts to find suitable properties to rehabilitate for Section 8 housing, and who also assisted with preparing the properties for rental. She stated that both contractors and vagrants had stolen from the properties after they were purchased, upsetting the Avignones' plans to rent the homes. The witness also testified that the requirements for Section 8 housing became more stringent in the relevant time period, making it more difficult for the Avignones to execute their plans. Susan also called a contractor they met at Mark Evans's seminar, who worked on creating various websites to solicit investors and who they paid $150.

Susan called a forensic accountant, Richard Holstrom, to challenge Boyne's testimony. Holstrom testified that some of the expenses Boyne categorized as personal were actually business expenses that were properly funded with the victim's investments. Specifically, he opined the life insurance policy the Avignones had paid $46,602 in premiums on and that listed Susan as the beneficiary was a business expense. Holstrom also testified that the $20,000 from Branch's initial $70,000 contribution was returned to her and not properly included as part of the losses she sustained. Finally, Holstrom criticized Boyne's failure to account for property taxes the

17

Avignones paid on the homes they purchased, which Holstrom calculated to be $34,024.25.[5] Holstrom's opinion was that the victims loaned $786,000 to SABA, and $722,490 was spent on legitimate business activities from 2009 to 2016.

William took the stand in his own defense and testified over three days. William learned about Mark Evans's real estate program through another seminar and attended Evans's seminar in Atlanta. William was impressed with the strategy, and thought Evans's program was sound and that it would be profitable for him and his clients. William testified that he believed Evans would provide all the expertise needed to carry out the strategy.

William testified that the product Evans sold him did not turn out the way it was advertised, and that Evans's expertise and support was absent. William stated that after he collected investments from the victims, he was unable to find reliable contractors to refurbish the properties. Further, some of the properties he purchased were not located in areas that were approved for Section 8 housing. These problems were apparent in 2010, before Branch invested an additional $285,000, but William and Susan did not disclose them. William told the jury he had run into problems in business in the past, but because he had always come through successfully, he did not think it was necessary to tell Branch about the issues they were having in Georgia.

William said he purchased 11 properties, some were titled in his name, some in Susan's name, and some in SABA Investment's name. Seven properties, all located in Atlanta, were purchased for cash (using the victims'

---

[5] In rebuttal, the prosecution called Branch's counsel in the civil suit, James Swiderski. He testified that when he eventually sold the properties William transferred to Branch after settlement, he was required to pay back property taxes for the years 2011 through 2014 totaling approximately $40,000.

funds) with the assistance of the Section 8 consultant who testified, and who William wrongly believed worked for Evans. Three of the other four properties, located outside Atlanta in Dallas, Georgia, were purchased later using a modest down payment and lender financing. The fourth was purchased with cash. William planned to renovate the houses, then obtain additional financing at a higher home valuation, and use the proceeds of those mortgages to fund payments to the victims.

William acknowledged that none of the victims were ever given first lien positions on any of the properties, even though some of the promissory notes stated liens would be provided. William explained he tried to get the investors listed as first lien holders on the properties, but he could not get Evans's team to help him accomplish the task and he did not know how to do it himself.

William testified he never intended to use the victims' investments to pay his personal expenses but when the real estate scheme started to fail, he did. He did not disclose this to the victims because he was embarrassed and thought he could turn things around. William stated by the time he solicited Lopez's and Blowers's investments, he knew the business was failing. He testified he told Blowers (but not Lopez) the scheme was not working as planned, but he believed he could turn it around if he could get additional capital.

William also explained the insurance policy he purchased and a subsequent loan on the policy. He testified he obtained the policy to protect the investors, and he took the loan to invest in a motel in Atlanta that the website consultant he hired recommended. William thought this investment would turn things around, but he lost the entire $45,000 he put towards the motel. In the same time period, after he received the email from Branch

19

threatening litigation, William realized he was in trouble and sought legal advice. In 2012, he filed for Chapter 13 bankruptcy in order to "block" Branch's lawsuit. William stated he did not list the victims as creditors because he intended to pay them back fully, and did not want their debts to the victims erased or compromised.

William testified he never intentionally deceived any of the victims and he still intended to pay them what was owed. He also believed he was allowed to use the victims' funds for his personal expenses so long as he was able to meet his obligations under the promissory notes.

C. *Conviction and Sentencing*

William and Susan were each charged with nine counts of grand theft (Pen. Code, § 487, subd. (a), count 1 [Van de Vens], count 3 [Branch], count 5 [Branch], count 7 [Branch], count 9 [Wightman], count 11 [Wightman], count 13 [Lopez], count 15 [Blowers], count 17 [Blowers]) and nine counts of making false statements in connection with the sale of a security (Corp. Code, §§ 25401 & 25540,[6] count 2 [Van de Vens], count 4 [Branch], count 6 [Branch], count 8 [Branch], count 10 [Wightman], count 12 [Wightman], count 14 [Lopez], count 16 [Blowers], count 18 [Blowers].)

The information alleged that as to counts 1 through 5 and 9 through 12, the victims' date of actual or constructive knowledge tolled the statute of limitations pursuant to Penal Code section 803, subdivision (c). The information further alleged, as to all counts, that William and Susan committed two or more related felonies, a material element of which is fraud and embezzlement, which resulted in a loss of more than $500,000, within the meaning of Penal Code sections 186.11, subdivisions (a)(1) and (a)(2), and

[6] Subsequent undesignated statutory references are to the Corporations Code.

between $100,000 and $500,000 within the meaning of Penal Code section 186.11, subdivision (a)(3).

After the lengthy trial, the jury found William and Susan guilty of all counts except 1 (grand theft related to Van De Vens), 3 (grand theft related to Branch), and 9 (grand theft related to Wightman), upon which they could not reach verdicts. The jury also found the aggravated white collar crime enhancements true. The following month, the court sentenced William to 13 years in state prison and Susan to 7 years in state prison. Susan and William both timely appealed the judgments of conviction.

DISCUSSION

I

*Bailey Doctrine*

William first argues, with Susan joining, that his grand theft convictions must be consolidated as a matter of law under the *Bailey* doctrine because the crimes were part of one continuing impulse, intent, plan, or scheme. Alternatively, he contends the court should have given the jury an instruction based on *Bailey*. The Attorney General responds that because the convictions related to different victims, the *Bailey* doctrine is inapplicable. Further, even if the multiple victim exception to the doctrine does not apply, each theft was sufficiently different for the crimes to be individually charged. As we explain, we agree the *Bailey* doctrine is not applicable in this case. Therefore, we do not reach William's alternative instructional error argument.

A

In *Bailey*, the California Supreme Court determined a series of over-payments to the defendant by a welfare office, which were the result of one misrepresentation, were properly aggregated to form one count of grand

21

theft, rather than multiple separate charges of petty theft.  (*Bailey, supra*, 55 Cal.2d at pp. 518–519.)  The defendant falsely told the welfare authorities that the man who lived with her was not her husband and did not contribute to the household financially, resulting in monthly overpayments by the welfare department.  (*Id.* at p. 518.)

The Supreme Court approved the trial court's instruction, which stated "that if several acts of taking are done pursuant to an initial design to obtain from the owner property having a value exceeding $200, and if the value of the property so taken does exceed $200, there is one crime of grand theft, but that if there is no such initial design, the taking of any property having a value not exceeding $200 is petty theft." (*Bailey, supra*, 55 Cal.2d at p. 518.) The court explained, "a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.)  *Bailey* also makes clear that "[w]hether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case."  (*Ibid.*; see also *People v. Reid* (2016) 246 Cal.App.4th 822, 834 ["[A]pplication of the *Bailey* rule requires consideration of the facts unique to each case."] (*Reid*).)

Subsequent courts of appeal applied *Bailey* in the manner William advances here, allowing defendants to obtain the dismissal of convictions where there are multiple thefts committed pursuant to the same scheme, impulse or plan.  (See, e.g., *People v. Kronemeyer* (1987) 189 Cal.App.3d 314, 363–364 (*Kronemeyer*) [reversing three counts of theft from one victim that were part of the same scheme]; *People v. Brooks* (1985) 166 Cal.App.3d 24, 30–32 (*Brooks*) [reversing all but one theft conviction arising from the theft of proceeds from the sale of 14 pieces of equipment at one auction]; *People v.*

*Tabb* (2009) 170 Cal.App.4th 1142, 1148 [recognizing a series of thefts from an employee over a period of time was properly charged as one grand theft]; *People v. Packard* (1982) 131 Cal.App.3d 622 [reversing two of three grand theft convictions based on the submission of a series of false invoices]; *People v. Gardner* (1979) 90 Cal.App.3d 42 [reversing three of four counts of grand theft of animal carcasses]; *People v. Richardson* (1978) 83 Cal.App.3d 853 [reversing three of four counts of attempted grand theft based on attempting to obtain payments on four fraudulent warrants]; and *People v. Sullivan* (1978) 80 Cal.App.3d 16 [reversing eight of nine counts of grand theft based on receipt of a series of cashier's checks under a single fraudulent scheme].)

In *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), the Supreme Court revisited the *Bailey* doctrine. The court refined the doctrine, disapproving *Kronemeyer*, *Brooks*, and other similar decisions that had used the doctrine defensively in the way William requests here. *Whitmer* concluded those cases had "interpreted *Bailey* more broadly than is warranted." (*Whitmer,* at p. 735.) The defendant in *Whitmer* was the manager of a motorcycle dealership who arranged for the fraudulent sale of 20 vehicles to fictitious buyers through the use of falsified financing agreements, resulting in a loss to the dealership. (*Ibid.*) The 20 transactions occurred on 13 different dates, to distinct fictitious buyers for different vehicles. (*Ibid.*) In concluding these transactions were properly viewed as distinct crimes, the court noted that in this case, "and, generally, in the earlier cases the *Bailey* court distinguished, *the defendant committed separate and distinct fraudulent acts*." (*Id.* at p. 740, italics added.) "This," the court stated, "makes all the difference." (*Ibid.*)

*Whitmer* reviewed the earlier cases *Bailey* had distinguished but did not overrule, explaining those cases (*People v. Stanford* (1940) 16 Cal.2d 247

23

(*Stanford*), *People v. Rabe* (1927) 202 Cal. 409 (*Rabe*), and *People v. Ashley* (1954) 42 Cal.2d 246 (*Ashley*)) " 'embody the reasonable view that a defendant who repeatedly takes property exceeding the requisite amount for grand theft from a victim through separate transactions [citation]—but pursuant to a single scheme or overarching misrepresentation—commits more crimes than a defendant who takes such property only once. Indeed, a contrary view would give a "felony discount" to the thief who perfects a scheme to commit multiple acts of grand theft.' " (*Whitmer, supra*, 59 Cal.4th at p. 739.)

In *Stanford, supra*, 16 Cal.2d 247, " 'a lawyer entrusted with control of an elderly woman's property obtained her permission to use her funds to buy property for her. (*Id*. at pp. 248–249.) He took title to the property in his own name and made three payments of the entrusted funds for its purchase, each of which exceeded the threshold amount constituting grand theft. (*Id*. at pp. 248–250.) Following his conviction of three counts of grand theft, the *Stanford* court affirmed, stating: "There is no merit in appellant's contention that the entire transaction could not constitute more than one offense, and that the conviction of three separate offenses was error. ... In the present case the evidence showed that the thefts referred to in the first three counts of the indictment were separate and distinct transactions, which occurred on different dates, and involved the taking of different sums of money. Such separate transactions constituted separate offenses. [Citations.]" ' " (*Whitmer, supra*, 59 Cal.4th at pp. 738–739.)

" 'In *Rabe*, the defendant fraudulently obtained money and property by falsely representing that he intended to use the funds and property to establish a corporation. (*Rabe, supra*, 202 Cal. at p. 417.) From one individual he secured investments on three separate dates: a payment for $1,250, a payment for $4,000, and a contribution of real property worth

24

$11,000. (*Ibid.*) ... [T]he Supreme Court rejected his contention that he had committed only a single offense, reasoning that "[i]n each count of the indictment the property ... was obtained at a different time and was different in character and value ...." ' " (*Whitmer, supra,* 59 Cal.4th at p. 738.)

" 'In *Ashley*, the manager of a corporation obtained funds from two individuals by falsely representing that the funds would be used for one of the corporation's business projects. (*Ashley, supra*, 42 Cal.2d at pp. 252–257.) Because the manager received two payments from each individual, each of which exceeded the threshold amount for grand theft, he was charged with four counts of grand theft. (*Ibid.*) Before the Supreme Court, he contended that he could be convicted on only one count of grand theft with respect to each victim. (*Id.* at p. 273.) Relying on *Rabe*, the court rejected this argument.' " (*Whitmer, supra,* 59 Cal.4th at p. 738; see also *Id.* at pp. 738—739 [explaining "the remaining cases cited by *Bailey* ... reached similar conclusions on similar facts. (*People v. Barber* (1959) 166 Cal.App.2d 735, 736–738 [defendant properly convicted of two counts of grand theft after obtaining two payments exceeding minimum necessary for grand theft from single victim who intended to invest in defendant's bogus mining company]; *People v. Caldwell* (1942) 55 Cal.App.2d 238, 242–243, 252 [defendant who falsely represented he was providing insurance to victim properly convicted of five counts of grand theft based on five separate premium payments, each exceeding minimum necessary for grand theft]; *People v. Ellison* (1938) 26 Cal.App.2d 496, 497–499 [defendants properly convicted of three counts of grand theft for receiving three separate payments from creditor, each exceeding minimum necessary for grand theft, based on presentation of falsified contracts to creditor indicating that defendants were selling goods to others].)"].)

25

Following these cases, *Whitmer* held that "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, *even if* committed pursuant to a single overarching scheme," overruling contrary appellate court decisions. (*Whitmer, supra*, 59 Cal.4th at p. 741, emphasis added.) The court, however, declined to apply the rule to the defendant in that case retroactively because of "the long, uninterrupted series of Court of Appeal cases, beginning with *People v. Sullivan, supra*, 80 Cal.App.3d 16, decided in 1978, and including *People v. Kronemeyer, supra*, 189 Cal.App.3d 314, decided in 1987, that have consistently held that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft." (*Id*. at p. 742.)

B

Although William concedes *Whitmer* effectively narrowed the *Bailey* doctrine, he argues *Whitmer* does not apply retroactively to this case and *Bailey* controls because his and Susan's thefts were "committed pursuant to one continuing impulse, intent, plan or scheme, to result in a single theft conviction." Thus, he argues his convictions for grand theft, counts 5, 7, 11, 13 and 17, must be consolidated into a single conviction.

The Attorney General responds that because the convictions relate to different victims, the *Bailey* doctrine is inapplicable. Further, he asserts the two cases William and Susan primarily rely on to support their argument that consolidation is appropriate even for multiple victims, *Brooks, supra*, 166 Cal.App.3d 24 and *People v. Columbia Research Corp*. (1980) 103 Cal.App.3d Supp. 33 (*Columbia Research*), have been heavily criticized and are distinguishable. Finally, the Attorney General argues that even if the multiple victim exception to the *Bailey* doctrine does not apply, each theft was sufficiently different to support the separate grand theft convictions.

26

As William asserts in his reply brief, the number of victims is one factor, not alone determinative, to be considered in deciding whether the theft offenses should be consolidated. (*In re Arthur V.* (2008) 166 Cal.App.4th 61, 68, fn. 4.; see also *Whitmer, supra,* 59 Cal.4th at p. 738, quoting *Rabe, supra,* 202 Cal. at p. 413 ["when a defendant obtains property through false representations to the victim, the defendant may be separately punished for obtaining additional property from the victim, even though the initial misrepresentations 'were still operating upon the mind" of the victim' "].) However, we agree with the Attorney General that this case falls outside the since-restricted *Bailey* doctrine. Like those cases *Bailey* distinguished and unlike *Bailey* itself, here there were unquestionably "separate and distinct fraudulent acts" committed by the defendants. (*Whitmer,* at p. 740.) While the overarching scheme used by the Avignones was similar from victim to victim, the crimes are appropriately categorized as separate offenses because there were separate victims, the fraudulent investments were solicited at different points in time, later investments were solicited to pay prior victims, and the precise fraudulent statements used to solicit the investments differed from victim to victim.

In the parlance of *Bailey*, this was not a scheme that was the result of "one impulse" or one plan executed at one time. (Cf. *Bailey, supra,* 55 Cal.2d at p. 518 [defendant fraudulently denied marriage in one deception, resulting in a series of welfare payments that were too high; this was "a single plan [in which the] defendant ma[de a] false representations and receive[d] various sums from the victim"]; see also *Reid, supra,* 246 Cal.App.4th at pp. 834–835 [theft of nine urns at one time were appropriately considered separate thefts: "Although the nine urns were stolen from the mausoleum during a single crime spree, each urn was contained in a separate niche covered by its own

27

pane of glass. … Additionally, the urns were purchased separately and were the property of separate victims"]; *People v. Garcia* (1990) 224 Cal.App.3d 297, 307 [rejecting argument that four separate instances of falsifying bonds were pursuant to one scheme].)

*Brooks* and *Columbia Research*, on which William primarily relies, do not lead us to conclude otherwise. *Brooks*, which was decided under the framework of Penal Code section 654, involved a *single* auction, at which the defendant auctioneer absconded with the profits of the sale of farm equipment that was entrusted to him by 14 different people. (*Brooks, supra*, 166 Cal.App.3d at p. 27.) *Columbia Research* was an appeal of a demurrer to a complaint in which the People alleged thousands of thefts of $15.95 could be combined to assert a charge of grand theft, rather than multiple petty theft charges. The corporate defendant offered three-night hotel stays in exchange for $15.95 and collected thousands of checks but offered nothing in return. The appellate department opinion held that the complaint as pleaded was not sufficient to show a common scheme, but granted leave to amend the complaint to add additional allegations of a single plan. (*Columbia Research, supra*, 103 Cal.App.3d Supp. at p. 41.) These cases are plainly distinguishable, and do not support consolidation or reversal of the multiple theft convictions in this case.

## II

### *Unanimity Instruction*

William, with Susan joining, next asserts the court erred by failing to instruct the jury that they must agree whether the grand thefts were committed by false pretense or embezzlement. The Attorney General responds that the issue was forfeited but even if properly considered,

28

unanimity is not required because under existing precedent, the jury was allowed to be split on the applicable theory of theft.

At a hearing before trial, Susan's counsel argued a unanimity instruction on the theory of theft was required. The court declined to rule on the argument, but stated it did not think such an instruction was needed because the jury could be divided on the form of theft. The court pointed to CALCRIM No. 1861 to support this position.

At a later jury instruction conference, Susan's counsel again raised the issue, arguing that despite the language of CALCRIM No. 1861, which states the jurors do not need to agree on the same theory of theft to convict, the jury was required to agree on which act constituted the theft and thus a unanimity instruction was required. William's counsel agreed with Susan's objection but conceded there was case law that was contrary to that position.

Near the end of the trial, after the instructions were given and the prosecutor had presented his initial closing argument, the trial court raised the issue again, stating it did not think that the unanimity instruction was required. Susan's counsel responded that it was required because the jury needed to agree with respect to each count which actions supported a particular charge. Susan's counsel explained, using Branch as an example, that "there's a possibility that a jury could convict, for example, using the facts from the $70,000 note and convict on the $245,000 note using those facts," which is not permitted. William's counsel agreed, urging the court to act cautiously and provide the unanimity instruction.

The court instructed the jury on theft by false pretenses and theft by embezzlement using CALCRIM No. 1804 and CALCRIM No. 1806,

29

respectively.[7]  The court also instructed the jury, using CALCRIM No. 1861, that as to the nine counts of grand theft charged:

> "The Defendants have been prosecuted for theft under two theories:  Theft by false pretenses and embezzlement.  Each theory of theft has different requirements, and I will instruct you on both.  You may not find a defendant guilty of theft unless all of you agree that the People have proved that the defendant committed theft under at least one theory.  But all of you do not have to agree on the same theory."

B

"A claim of instructional error is reviewed de novo."  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution.  [Citations.]  The challenged instruction is viewed 'in the

---

[7]    With respect to false pretense, the court instructed the jury:  "The defendants are charged in Counts 1, 3, 5, 7, 9, 11, 13, 15, and 17 with grand theft by false pretense in violation of Penal Code Section 487.  To prove that a defendant is guilty of this crime the People must prove that:  One, the defendant knowingly and intentionally deceived a property owner by false or fraudulent representation or pretense.  Two, the defendant did so intending to persuade the owner to let the defendant take possession and ownership of the property.  And, three, the owner let the defendant take possession and ownership of the property because the owner relied on the representations or pretense."

With respect to embezzlement, the court instructed:  "The defendants are charged in Counts 1, 3, 5, 7, 9, 11, 13, 15, and 17 with grand theft by embezzlement in violation of Penal Code Section 487.  To prove that a defendant is guilty of this crime the People must prove that:  One, an owner entrusted his or her property to the defendant.  Two, the owner did so because he or she trusted the defendant.  Three, the defendant fraudulently converted the property for his or her own benefit; and, four, … when the defendant converted the property he or she intended to deprive the owner of it or its use."

30

context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

The jury unanimity requirement ensures that for a conviction to be valid, the defendant is found guilty of the specific crime of which adequate notice has been given in the charges and trial proceedings. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Russo, supra*, 25 Cal.4th at p. 1132.) "[U]nanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty

of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction." (*Id*. at p. 1135.)

With respect to a theft prosecution, a jury must unanimously agree the defendant is guilty of theft, but it need not agree as to what theory underlies the theft.  Historically, theft was divided into three separate statutory crimes:  larceny, theft by false pretense, and embezzlement.  (*People v. Gonzales* (2017) 2 Cal.5th 858, 865 (*Gonzales*).)  This "disaggregation of theft into different statutes created pleading challenges." (*Id*. at p. 864.)  As a result, in 1927, the legislature amended the theft statutes "to define a general crime of 'theft.'  Theft was defined expansively to include all the elements of larceny, false pretenses, and embezzlement." (*Id*. at p. 865.)  The amendments "reflected the fact that the definition of theft encompassed all three ways in which property could be unlawfully stolen." (*Ibid*.)

" 'The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law.  Indictments and informations charging the crime of "theft" can now simply allege an "unlawful taking." [Citation.]  Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an "unlawful taking" has been proved.' " (*Gonzales, supra*, 2 Cal.5th at p. 865.)  The amendments were " 'designed not only to simplify procedure but also to relieve the courts from difficult questions arising from the contention that the evidence shows the commission of some other of these crimes than the one alleged in the indictment or information, a contention upon which defendants may escape just conviction solely because of the border line distinction existing between these various crimes.' " (*Ibid*.)

" 'The elements of the several types of theft … have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses.' [Citations.] In other words, the crime is called theft, but to prove its commission, the evidence must establish that the property was stolen by larceny, false pretenses, or embezzlement." (*Gonzales, supra*, 2 Cal.5th at pp. 865–866.) Further, "[t]he trial court must instruct on the theory of theft applicable based on the evidence presented. [Citation.] However, the jury need not unanimously agree on which type of theft a defendant has committed and 'it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell.' " (*Gonzales,* at p. 866, fn. 9.)

## C

As an initial matter, on this record, we agree with William that trial counsel raised the issue unsuccessfully, preserving the issue for our review. Further, the failure to give such an instruction, if required, would infringe on the defendants' fundamental rights, allowing review even without an objection below. However, we do not agree with William that the court erred by giving CALCRIM No. 1861 or in failing to give a unanimity instruction.

As noted, William asserts that it was error for the court to provide CALCRIM No. 1861 because the cases that form the basis for that instruction, unlike here, involve "situation[s] in which the same act supported either theory of theft given to the jury." Here, however, as the Attorney General points out, there was substantial evidence to support either theory of theft. Either that William and Susan intended to defraud the investors at the outset of the scheme, or that their intentions changed after obtaining the funds and the funds were fraudulently diverted for personal

33

use.  Thus, the court properly instructed the jury on both theories of theft. (See *People v. Vidana* (2016) 1 Cal.5th 632, 649 ["[A] trial court properly instructs a jury on the elements of larceny and embezzlement if both instructions are supported by substantial evidence.  As we have long recognized, a trial court also properly instructs a jury that it need not unanimously agree on whether a defendant committed larceny or embezzlement."].)

Critically, the prosecution charged the defendants with separate thefts based on each separate investment made, not based on a theory of theft related to each transaction.  If a victim wrote separate checks, those transactions were charged as separate crimes.  Thus, count 1 was the grand theft of $27,000 given to the Avignones by the Van De Vens on April 22, 2009; count 3 was the grand theft of $70,000 given by Branch on June 15, 2009; count 5 was grand theft of the additional $245,000 given by Branch on February 11, 2010; count 7 was the additional $40,000 given by Branch on June 16, 2010; count 9 was grand theft of $100,000 given by Wightman on June 16, 2009; count 11 was the additional $50,000 given by Wightman on June 23, 2009; count 13 was the grand theft of $200,000 given by Lopez on January 27, 2010; count 15 was the grand theft of $54,000 given by Blowers on May 6, 2010; and count 17 was the grand theft of the final $20,000 Blowers contributed on April 15, 2011.

In closing, the prosecutor accurately explained that there were two theories available for the jurors to find the Avignones guilty of each grand theft charge.  He stated: "[E]ach theory—either theft by false pretense or theft by embezzlement—has certain requirements.  And say, for example, the Van De Vens some of you might be convinced beyond a reasonable doubt that the defendants are guilty … of grand theft under an embezzlement theory,

34

and some of you may be convinced beyond a reasonable doubt that they're guilty [under a] false pretense theory … as long as you are convinced beyond a reasonable doubt that they're guilty under one theory or the other, two of you don't have to agree on the same theory."

Contrary to William's assertion, the act at issue is not the method by which the theft was accomplished (i.e. either false pretense or embezzlement). Rather, the act that the jury was required to agree upon is the unlawful taking of a specific sum of money from the victims. William's characterization of the "wrongful act" as *either* theft by false pretense or embezzlement is too narrow and not in conformance with the law. The cases he cites, also set forth in the notes for CALCRIM No. 1861, show the principle in action and support our determination that the trial court properly instructed the jury that unanimity in the theory of theft was not required.

In *People v. Nor Woods* (1951) 37 Cal.2d 584 (*Nor Woods*), the defendant car dealer purported to sell the victim a car in exchange for another car and a cash payment. (*Id*. at p. 585.) The dealer represented to the buyer that the car had a lien in the amount of the cash payment, which he would pay off upon receipt of the funds. The dealer failed to make the lien payment, absconding with the cash, and the car was repossessed from the bank. (*Ibid*.) The dealer was charged with, and convicted of, grand theft. On appeal, the dealer argued reversal was required because the court failed to instruct the "jury that they must agree upon the method by which the theft was committed." (*Id*. at p. 586.) The Supreme Court rejected this argument. It explained that if the victim "intended that only possession of the [exchanged car] should pass at the time of the sale, defendant was guilty of larceny by trick or device, but if [the victim] intended that title should pass, defendant was guilty of obtaining property by false pretenses." (*Ibid*.)

35

The court held that "[i]rrespective of [the victim's] intent, however, defendant could be found guilty of theft by one means or another, and since by the verdict the jury determined that he did fraudulently appropriate the property, it is immaterial whether or not they agreed as to the technical pigeonhole into which the theft fell." (*Nor Woods, supra*, 37 Cal.2d at p. 586.) Likewise here, so long as the jury agreed that the specific property (in this case a certain sum of money) was fraudulently taken by the Avignones, it was not required to agree by which theory of theft the taking occurred.

*People v. McLemore* (1994) 27 Cal.App.4th 601 (*McLemore*), cited by William's trial counsel as contrary to the defense position, likewise supports affirmance. There, the defendant entered a clothing store and picked up a dress. When a store employee asked him if he needed assistance, the defendant said he wanted to exchange the dress for a different size. (*Id.* at p. 604.) The employee questioned whether he had purchased the dress since it still had its tag and security sensor on it. The defendant became belligerent and the employee eventually let the defendant leave with the dress. (*Id.* at pp. 604–605.) At trial, the defendant argued a unanimity instruction was required because the prosecution alleged two separate acts of theft, theft by trick and device (based on the defendant's statement the dress was his) and simple larceny (based on intimidation of the store employee). (*Id.* at p. 605.)

The Court of Appeal rejected the defendant's argument. In so doing, it framed the issue succinctly: "The crux of the present controversy deals with the meaning of a unanimous criminal verdict. Must the jurors agree the defendant committed the ultimate statutory offense of theft or must they also agree on his course of conduct in accomplishing the crime?" (*McLemore, supra*, 27 Cal.App.4th at p. 605.) The court then surveyed the existing case

36

law to conclude the jury was not required to agree on the course of conduct used to accomplish the theft. (*Ibid.*)

William argues that in *McLemore* there was only one act that supported two theories of theft advanced by the prosecution, which he asserts distinguishes the facts here. This is an inaccurate characterization of *McLemore*. The case involved two theories of theft, based on two theories of conduct by the defendant reasonably inferred from the evidence. The same is true here. Either William and Susan were deceitful from the outset, supporting the theory of theft by false pretense, or their intentions became fraudulent at the time they used the money for their personal benefit, supporting the theory of embezzlement. Substantial evidence was admitted for both theories and the jurors could convict on either theory without agreement on which occurred.[8]

William's claim that the United States Supreme Court's opinion in *Richardson v. United States* (1999) 526 U.S. 813 (*Richardson*) required the jury to agree on the theory of theft is also misplaced. *Richardson* interpreted a federal drug statute to require unanimity on certain drug crimes that were elements of the larger crime of engaging in a criminal enterprise. As

---

[8] William also argues that *People v. Counts* (1995) 31 Cal.App.4th 785 provides support for his contention that a unanimity instruction was required. *Counts*, however, addressed the issue of whether the victim's retention of a security interest in the stolen property prevented a conviction of theft by false pretenses. The defendant argued the facts supported only a charge of larceny by trick because of the remaining security interest, that prevented title from passing entirely to the thief. (*Id*. at p. 788.) In concluding the security interest did not negate the charge, the court noted that because theft could be found under either theory, there was no prejudice to the defendant in the jury's verdict of guilt by the theory of false pretense. (*Id*. at p. 792.) *Counts* does not support William's argument that the jury was required to unanimously agree on the theory of theft in this case.

explained in *People v. Vargas* (2001) 91 Cal.App.4th 506, "the United States Supreme Court determined that the statutory phrase 'series of violations' [contained in the criminal enterprise code provision] 'create[s] several elements, namely the several "violations," in respect to *each* of which the jury must agree unanimously and separately.' [Citation.] Because each 'violation' was an element of the crime, the jury had 'to agree unanimously about which specific violations make up the "continuing series of violations." ' " (*Vargas,* at p. 560, quoting *Richardson,* at pp. 815, 817–818.)

*Richardson* has no application here. The statutory scheme at issue in that case is not comparable to the California theft statute. Nor is Williams' reliance on the dissenting opinion in *Schad v. Arizona* (1991) 501 U.S. 624 availing. As explained by the Supreme Court in *People v. Grimes* (2016) 1 Cal.5th 698, 727–728, "[w]hen a defendant's alleged conduct constitutes a single offense that may be committed in different ways, the federal Constitution does not require unanimity on how the crime was committed. (*Schad v. Arizona, supra*, 501 U.S. 624 [due process clause of U.S. Const. does not require jury to agree unanimously whether charge of first degree murder was committed by an intentional, premeditated killing or by felony murder].)"

As the Attorney General points out, acceptance of William's theory would require this court to ignore binding precedent on the unanimity requirements of theft; a position we reject. In sum, the trial court's failure to require the jury to agree on which theory supported the grand theft charges was not error.

## III

### *Uncharged Conspiracy Instruction*

William, with Susan again joining, next asserts the trial court erred by giving an uncharged conspiracy instruction. Specifically, he contends that

because the object of a conspiracy cannot be negligence, and the securities fraud instruction provided to the jury allows guilt to be based on criminal negligence, his convictions must be overturned.

The Attorney General responds first that the issue was forfeited. Next, he contends there was no error because to be convicted of the crime, the prosecution was required to prove the sale of the security was willful. Further, the conspiracy instruction also requires intent, negating William's assertion the conviction was based merely on negligence. Finally, the Attorney General asserts that even if there was instructional error, it was harmless.

A

At a jury instruction conference, the parties discussed CALCRIM No. 416, the pattern instruction concerning evidence of an uncharged conspiracy. When the court asked Susan's counsel her position on the instruction, she responded "I think this is a lot of stuff." William's counsel stated, "I think this is very cumbersome." The court agreed, then stated, "Now we get to, is it required to be given? Is it a viable theory?" Susan's counsel did not object and William's counsel responded that it was a confusing instruction, and that he had "a general objection … to this particular instruction when there is no conspiracy that is charged." He continued, "I think it gets very confusing for the jury, but if [the prosecutor] wants it, and I think that the case law is pretty specific, the Court can give it. … I'm not necessarily objecting to it other than my global objection." The court then stated it would provide the instruction.

The court thus instructed the jury with CALCRIM No. 416:

"I have explained that a defendant may be guilty of a crime if he either commits the crime or aids and abets the crime. … If he or she either commits the crime or aids and abets the crime, he or

39

she may also be guilty if he or she is member of an uncharged conspiracy. ... A member of a conspiracy is criminally responsible for the acts or statement of any other member of the conspiracy done to help accomplish the goal of the conspiracy.

"To prove that a defendant was a member of the conspiracy in this case the People must prove that: One, the defendant intended to agree and did agree with the other defendant to commit grand theft or securities fraud. Two, at the time of the agreement the defendant and the other defendant intended that one or more of them would commit grand theft or securities fraud. Three, one of the defendants committed at least one of the following overt acts to accomplish grand theft or security fraud.

"[Overt acts.[9]]

"[¶] ... [¶]

---

[9] The instruction listed nine overt acts: (1) "On or about April 9, 2009, the defendants offered by phone a 'turnkey' private real estate investment to … Van de Ven in which they guaranteed '1st lien position' on real property acquired with their funds. [(2)] On April 9, 2009, the defendants conveyed details of their 'turnkey' private real estate investment to …Van de Ven via email in which they guaranteed '1st lien position' on real property acquired with their funds. [(3)] On or about April 22, 2009, the defendants emailed a promissory note to Van de Ven in which they listed the terms of their 'turnkey' investment. [(4)] On May 5, 2009, the defendants wired $16,780.38 to Atlanta to acquire real estate using the Van de Vens' funds. [(5)] On June 17, 2009, the defendants purchased real property using the Van de Vens' funds but failed to list the Van de Vens as 1st lien position holders. [(6)] On May 5, 2009, Susan Avignone opened a bank account under SABA investments with Navy Federal [(7)] On June 15, 2009, the defendants met with Otilia Branch to offer a 'turnkey' private real estate investment in which they guaranteed '1st lien position' on real property acquired with her funds. [(8)] On July 20, 2009, the defendants wired $7,556.68 to Atlanta to acquire real estate using Ms. Branch's funds. [(9)] On August 17, 2009, the defendants purchased real property using Ms. Branch's funds but failed to list Ms. Branch as 1st lien position holder."

40

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit grand theft or securities fraud.

"[¶] … [¶]

"Someone who merely accompanies or associates with the members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy."

The court next instructed the jury with CALCRIM No. 417, informing them that to prove that defendant is guilty of the crimes charged under a conspiracy theory of liability the People must establish (1) "the defendant conspired to commit one of the following crimes. Grand theft or securities fraud. [(2) A] member of the conspiracy committed grand theft or securities fraud to further the conspiracy; and [(3)] grand theft and/or securities fraud was a natural and probable consequence of a common plan or design of the crime that the defendant conspired to commit."

As to the securities fraud counts, the court instructed the jury that the People must prove:

"[(1) T]he defendant willfully offered to sell or sold a security in California. [(2) T]he offer to sell or sale was made by means of a written or oral communication. [(3) T]he communication included "A" an untrue statement of material fact or "B" omitted to state a material fact necessary to make the statements made in light of the circumstances under which the statements were not misleading. [(4) T]he defendant knew or should have known the statement was false or the omitted fact made the statement misleading. [(5)] The defendant knew or should have known that the statement or omitted fact was—was material or was criminally negligent in failing to know or discover that a representation or omission of material fact was untrue.

"The truth or falsity of a representation and the materiality of an omission must be determined on the basis of what the seller knew or should have known at the time of the sale. ... A fact is material if there is a substantial likelihood that under all of the

41

circumstances a reasonable investor would consider it important in reaching an investment decision. A failure to disclose a fact alone is not sufficient. Even where the disclosed fact is material.

"Criminal negligence means conduct which is more than ordinary negligence. Ordinary negligence is the failure to exercise ordinary or reasonable care. Criminal negligence refers to negligen[t] acts that are aggravated, reckless, or flagrant and are such a departure from the conduct of an ordinarily prudent and careful person under the same circumstances as to constitute indifference to the consequences of those acts. The fact must be that such the [sic] consequences of negligent acts could reasonably [have] been foreseen, and it must appear that the consequences of those acts were not the result of inattention, mistake in judgment or misadventure but the natural and probable result of an aggravated, reckless, or flagrantly negligent act."

## B

"The doctrine of conspiracy plays a dual role in our criminal law. First, conspiracy is a substantive offense in itself—'an agreement between two or more persons that they will commit an unlawful object (or achieve a lawful object by unlawful means), and in furtherance of the agreement, have committed one overt act toward the achievement of their objective.' [Citations.] Second, proof of a conspiracy serves to impose criminal liability on all conspirators for crimes committed in furtherance of the conspiracy." (*People v. Salcedo* (1994) 30 Cal.App.4th 209, 215; see *People v. Valdez* (2012) 55 Cal.4th 82, 150 ["Our decisions have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.' "].) Accordingly, the prosecution may argue that a conspirator can be criminally liable for the acts of her coconspirator in furtherance of the conspiracy. Where the prosecutor has "not charge[d] conspiracy as an offense, but [has] introduced evidence of a conspiracy to

42

prove liability, the court ha[s] a sua sponte duty to give uncharged conspiracy instructions." (*People v. Williams* (2008) 161 Cal.App.4th 705, 709.)

A claim of instructional error must be viewed " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) To preserve a claim of instructional error for appellate review, the defense must object on the specific grounds raised on appeal in the trial court. (See *People v. Lang* (1989) 49 Cal.3d 991, 1024 ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."] (*Lang*).) Failure to do so forfeits the issue. (*People v. Hart* (1999) 20 Cal.4th 546, 622 (*Hart*).)

### C

As an initial matter, we agree with the Attorney General that William did not preserve this issue for review. He now argues that the uncharged conspiracy instruction was incorrect because it allowed the jury to find him liable as an uncharged conspirator based only on negligence. However, neither defense attorney asserted the uncharged conspiracy instruction was problematic on this basis. They stated only that CALCRIM No. 416 was "cumbersome," "a lot of stuff," "confusing," and lodged a "general objection" to the instruction. Neither lawyer argued that the instruction was improper because it did not clarify for the jury that criminal liability resulting from a conspiracy is not properly based on criminal negligence. Indeed, William's counsel told the court that the case law was clear the instruction was proper. On this record, the issue was not preserved for our consideration. (See *Hart,*

*supra*, 20 Cal.4th at p. 622 ["Defendant's failure to request such a clarifying instruction at trial, however, waives his claim on appeal."].)

Even had William raised the issue in the trial court, however, we would not conclude the court erred by giving the uncharged conspiracy instruction. We agree with a recent decision of the Third District Court of Appeal, *People v. Koenig* (2020) 58 Cal.App.5th 771 (*Koenig*), which rejected the same argument. As in this case, the defendant in *Koenig* was convicted of violating section 25401 after the jury was instructed it could find liability based on a conspiracy theory. (*Id.* at p. 802.) On appeal, the defendant asserted that "the trial court erred in instructing the jury that it could convict him of section 25401 on either a conspiracy or aiding and abetting theory" because "section 25401 is a crime of negligence and is therefore incompatible with those theories of liability." (*Id.* at p. 794.)

After noting its general agreement with the principle that "one cannot conspire to commit a crime of negligence" because a "person cannot agree and specifically intend to accomplish an unintended result," the court concluded "section 25401 does not proscribe a negligent act, nor does it a proscribe a resulting harm. As such it is not incompatible with conspiracy liability." (*Koenig, supra*, 58 Cal.App.5th at p. 795.) "Section 25401 provides: 'It is unlawful for any person to offer or sell a security in this state, or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' Section 25540, which provides the criminal penalties for section 25401, includes a requirement that the conduct be *willful*. [Citation.] Accordingly, section 25401's actus reus — offering or selling a security by means of a

communication that includes an untrue material fact or omits a material fact — must be done willfully." (*Id*. at pp. 795–796.)

Thus, *Koenig* held that section 25401, which the California Supreme Court has characterized as a general intent crime, requiring scienter, " 'i.e., guilty knowledge of the facts which make the act a crime,' " is not a crime of negligence in the way that William argues. (*Koenig, supra*, 58 Cal.App.5th at p. 796.) Rather, the statute's use of criminal negligence "refers to an alternative way of proving the knowledge element" of the crime. (*Ibid*.) The use of criminal negligence "does not describe how the actus reus must be committed—and thus it does not convert section 25401 into a crime of criminal negligence." (*Ibid*.) We agree with this analysis and hold that section 25401 does not proscribe negligence in the manner William advances.

The cases that William relies on to support his argument do not lead us to a contrary conclusion. *U.S. v. Sdoulam* (8th Cir. 2005) 398 F.3d 981, discussed in *Koenig*, also rejected an argument like the one William makes. There, the defendant challenged the district court's denial of his motion to dismiss based on an argument that the federal statute for conspiracy to distribute a controlled substance improperly allowed for a conspiracy conviction based only on negligence. (*Id*. at pp. 987–988.) The court rejected this interpretation of the conspiracy charge: "The section does not punish the inadvertent sale of a listed chemical to an illegal drug manufacturer, but instead punishes only those sales where the seller understands*, or should reasonably understand*, that the chemical will be used illegally." (*Id*.at p. 988, italics added; see also *U.S. v. Mitlof* (S.D.N.Y. 2001) 165 F.Supp.2d 558, 562–564 [rejecting motion to dismiss on a similar theory]). The situation here is analogous. If the jurors concluded either defendant was liable for securities fraud as a conspirator, rather than a direct perpetrator, the law

45

required the jurors to find the crime was committed with a mens rea of knowledge, not mere negligence.

Because sections 25401 and 25540 are not crimes of negligence, the challenged conspiracy instruction did not improperly lead the jury to find a conspiracy to commit a negligent act. (Cf. *People v. Swain* (1996) 12 Cal.4th 593, [holding conspiracy to commit implied malice second degree murder is a legal impossibility because "it would be illogical to conclude one can be found guilty of conspiring to commit murder where the requisite element of malice is *implied*. Such a construction would be at odds with the very nature of the crime of conspiracy … precisely because commission of the crime could never be established, or be deemed complete, unless and until a killing actually occurred."].) Rather, the jurors were instructed that liability could be based on conspiracy if they found William and Susan *agreed* to sell promissory notes either *knowing* they had omitted or misrepresented material information *or* they agreed to sell the notes with *flagrant disregard* for their

victims' need for that information.  Either finding properly supported liability based on an uncharged conspiracy to commit an intentionally wrongful act.[10]

## IV

*Sufficient Evidence Supported the Jury's Determination*

*the Promissory Notes were Securities*

William next contends, with Susan joining, that insufficient evidence underpinned the jury's determination that each promissory note was a security under sections 25019 and 25401.  Relying on *People v. Black* (2017) 8 Cal.App.5th 889 (*Black*), William argues that because the promissory notes were not "an indiscriminate offering at large to the public" and allegedly individually negotiated with each victim, the notes could not be properly categorized as securities.  The Attorney General distinguishes *Black*, and

---

[10]    Another case cited by William, *Navarrete v. Meyer* (2015) 237 Cal.App.4th 1276 (*Navarrete*) further illustrates the point and supports the conclusion we reach.  *Navarrete* reversed summary judgment, in part on the grounds that a triable issue of fact remained on whether there could be joint tort liability based on civil conspiracy, where the defendant vehicle passenger, and alleged co-conspirator, encouraged the defendant driver to drive in an unsafe manner.  This court rejected the claim that conspiracy liability could not attach because the object of the conspiracy was a reckless act, holding "a jury could reasonably conclude that [the alleged co-conspirators] expressly or tacitly agreed that [the driver] would engage in an unlawful exhibition of speed, and knew that was the specific unlawful purpose of their agreement.  This conduct is sufficiently intentional to support a cause of action for conspiracy." (*Navarrete, supra*, 237 Cal.App.4th at p. 1294.)  Likewise, here, the jury could appropriately find that William and Susan agreed to commit securities fraud based on their flagrant disregard for the material facts.

responds that sufficient evidence supported the jury's finding that the notes were investment contracts, subject to securities regulation.

A

In assessing the sufficiency of the evidence supporting a criminal conviction, this court must " 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 139.) "When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

"We neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) "Resolution of conflicts and inconsistences in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid*.)

B

California's Corporate Securities Law, which was patterned after the federal Securities Act of 1933 (15 U.S.C. § 77b), " 'provides a comprehensive system of securities regulation' in California. (1 Marsh & Volk, Practice Under the Cal. Securities Laws (2011) § 1.01, p. 1–3 (Marsh & Volk.).)"

48

(*Black, supra*, 8 Cal.App.5th at p. 899.)  "[S]ections 25401 and 25540 'criminalize the sale or purchase of securities by means of oral or written communications which either contain false or misleading statements or omit material facts….'  Whether the promissory notes may be deemed securities presents a mixed question of law and fact:  ' "The definition of a security is a matter of law.  It is the judge's duty to instruct the jury concerning that definition:  the way in which a security is identified.  Whether a particular piece of paper meets that definition, however, is for the jury to decide." ' "  (*Ibid.,* fn. omitted.)

"[T]he corporate securities laws do not contain an 'all-inclusive formula by which to test the facts in every case.  And the courts have refrained from attempting to formulate such a test.  Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case.  In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.' "  (*People v. Figueroa* (1986) 41 Cal.3d 714, 736.)

"[S]ection 25019 defines 'security' by listing transactions and instruments deemed to be securities, including 'any note; stock; ... bond; ... evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; ... investment contract; ... or, in general, any interest or instrument commonly known as a "security" ....'  This list is 'expansive,' but is not applied literally.  [Citations.]  Rather, 'the "critical question" … is whether a transaction falls within the regulatory purpose of the law regardless of whether it involves an instrument which comes within the

49

literal language of the definition.' " (*Black, supra*, 8 Cal.App.5th at pp. 899–900.)

California courts rely on two tests to determine if a particular instrument is a security: "the risk capital test and the federal or *Howey* test. The risk capital test, articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815, describes ' "[1] an attempt by an issuer to raise funds for a business venture or enterprise; [2] an indiscriminate offering to the public at large where the persons solicited are selected at random; [3] a passive position on the part of the investor; and [4] the conduct of the enterprise by the issuer with other people's money." ' This test reflects the court's assessment that the term 'security' is defined broadly in order 'to protect the public against spurious schemes, however ingeniously devised, to attract risk capital.' " (*Black, supra*, 8 Cal.App.5th at p. 900.)

"The federal or *Howey* test," applicable here, and "formulated by the United States Supreme Court in [*S.E.C. v. W.J. Howey Co.* (1946) 328 U.S. 293,] 301 [(*Howey*)], asks 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' A common enterprise 'may be established by showing "that the fortunes of the investors are linked with those of the promoters," ' such as by a profit sharing arrangement. [Citation.] An expectation of profits produced by the efforts of others exists 'when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " ' " (*Black, supra*, 8 Cal.App.5th at p. 900.) "It is generally accepted that both the risk capital and federal tests may be applied, either separately or together; a transaction is a security if it satisfies either test." (*Ibid.*)

50

## C

Here, the court used the definition of a security set forth in *Howey*. It instructed the jury:

"A security is also called an investment contract.

"An investment contract is a transaction in which a person entrusts money or other capital to another, with the expectation of deriving a profit, income or some financial benefit from a business enterprise, the failure or success of which is dependent upon the managerial efforts of other persons.

"To find that an offering is a security, the people must prove the following:

"(1) A person entrusted money or capital to another;

"(2) The person entrusting the money or capital did so with the expectation of receiving profit, income, or financial benefit;

"(3) The failure or success of the business enterprise was dependent upon the managerial efforts of persons other than the ones who entrusted the money."

The jury concluded the notes were securities and found William and Susan guilty of violating sections 25401 and 25540 with respect to all five victims.

William argues insufficient evidence supported the jury's finding that the *Howey* test was satisfied because the promissory notes were no different than the note at issue in *Black*, in which the court dismissed securities fraud charges before trial after finding the note there was not a security. William argues that like the promissory note in *Black*, his notes "were not securities because: (1) the promissory notes resulted from personal negotiations and meetings between William and Susan and the investors; (2) few people were involved in the investments; (3) security in the properties was either included in the promissory notes or orally promised to the investors; and (4) the

51

promissory notes were unconditional promises to pay by William and Susan's business."

The investment at issue in *Black*, however, is much different than the scheme perpetrated by the Avignones. *Black* also involved a real estate investment, in property in Idaho the defendant planned to develop. The note at issue, individually negotiated with the lender, stated the LLC in which Black was the managing member would pay the lender either (1) his principal and interest at a certain rate based on profit if the property was sold; (2) a certain portion of the property; or, (3) if the property was not sold or developed in a year, the lender could elect to receive the principal invested and interest at a rate of 10%. (*Black, supra*, 8 Cal.App.5th at p. 893.) Black also put up his separate property as collateral on the loan. (*Ibid.*)

After the deal failed and investigators discovered the money had been spent by Black on his personal expenses, Black was charged with theft by false pretenses and securities fraud. (*Black*, 8 Cal.App.5th at pp. 894–895.) After several amendments to the charging information, the trial court eventually granted Black's motion to dismiss under Penal Code section 995, finding that the promissory note was not a security under either the risk capital or *Howey* tests. (*Id*. at p. 897.)

The People challenged the trial court's determination, and the Court of Appeal affirmed. Critical to the appellate court's decision was the fact that the note was individually negotiated with the alleged victim and offered *only* to him. (*Black, supra*, 8 Cal.App.5th at p. 906.) The investor testified that he would not have invested had Black not negotiated the guaranteed return at the investor's election after one year and "that he traveled with Black to Idaho to see the property," which the investor called " 'an obsession for both of us.' " (*Ibid*.) There was also no indication that the note was intended to be

offered to other investors, or sold more widely. (*Ibid.*) In concluding the note was not a security within the meaning of the Corporate Securities Law, the court was careful to state that it was not "finding that all one-on-one contracts are excluded as a matter of law from the definition of security. Rather the individualized nature of the transaction is one factor that must be considered in determining whether that transaction comes within the regulatory purpose and purview of the securities law." (*Id.* at p. 909.)

The single loan at issue in *Black* was unlike the investments made by the unsophisticated victims in this case. Each transaction, offered to five different individuals, involved a note with the same terms (only the lien language was removed from some of the notes) undermining William's assertion these were individually negotiated agreements like the note in *Black*. Further, William and Susan prepared pitch documents that were presented to multiple victims showing the instrument offered was the same from victim to victim and White testified that William asked her to invite anyone she knew that might have money to invest to hear his proposal. While the notes drafted by the Avignones were not a widely distributed instrument, the Avignones targeted existing life insurance clients and anyone who White could lobby, distinguishing this case from the close business relationship in *Black*. (See *People v. Miller* (1987) 192 Cal.App.3d 1505, 1510–1511 ["[T]hese investors were solicited from the general public and had no control over the success of the venture in which their money was placed."] (*Miller*).)

Further, unlike *Black*, the collateral promised to the investors was not the Avignones' own property, but first lien positions on the homes they intended to purchase in Georgia. The proposed liens were also never executed, and did not reduce any of the risk the victims assumed when they

53

purchased the notes. Finally, the loans here were far in excess of the value of what the Avignones claimed was the secured interests of the properties they did purchase, such that no resale or foreclosure of the homes could have made them whole or even close to whole. (See *Miller, supra*, 192 Cal.App.3d 1505, 1510 [holding notes to multiple investors in connection with a luxury home purchase scheme were securities, and observing the loans "were so far in excess of the value of the secured interests that no resale or foreclosure could recoup more than a few cents on the dollar to the individual lenders"].)

In sum, we reject William's assertion that the promissory notes were not properly characterized as securities under the *Howey* test because they were akin to the individualized note negotiated in *Black*. Rather, the evidence in the trial court showed the promissory notes fell well " 'within the regulatory purpose of the law ….' … [¶] … 'to protect the public against spurious schemes, however ingeniously devised, to attract risk capital.' " (*Black, supra*, 8 Cal.App.5th at p. 900.)

### V

*Sufficient Evidence Supported The Jury's*

*Determination That Susan Was Guilty of Securities Fraud*

Susan contends that the jury's securities fraud verdicts were not supported by sufficient evidence on two additional grounds. She argues there was no evidence she directly made, or aided, abetted or conspired to make, a material omission or untrue statement to any of the victims. Susan also contends that statements and omissions relied on by the prosecutor to support the charges were not materially misleading.

The Attorney General responds that the evidence showed Susan was an equal partner to William in the real estate scheme and that even if she did not directly make any materially false statements or omissions, she is

54

culpable as an aider and abettor or coconspirator.  With respect to the materiality of the false statements and omissions, the Attorney General asserts that the evidence showed the Avignones falsely told the victims—in person, over the phone, and through marketing materials—they were investing in a safe and secure business, that they were guaranteed regular interest payments at attractive rates for certain time periods, and that they were guaranteed profits on their principal.  Further, the evidence showed the Avignones omitted to share material information about their lack of experience in the real estate business, their inability to fulfill promises of first lien positions on the homes they purchased, and their own troubled financial situation.

## A

As discussed, when a conviction is challenged on appeal for insufficient evidence to support it, we apply the substantial evidence standard of review. (*People v. Vines* (2011) 51 Cal.4th 830, 869; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  In so doing, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the conviction.  (*Vines*, at p. 869; *Johnson*, at p. 578.)  Substantial evidence is evidence that is reasonable, credible, and of solid value such that a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 660.)  We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses.  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or

55

instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "The liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages." (*Id.* at p. 560.)

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) "The elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.' [Citations.] To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024–1025.)

Section 25401 provides that securities fraud can be committed by making "an untrue statement of a material fact" or omitting "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." (*People v. Simon* (1995) 9 Cal.4th 493, 510.) A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in reaching an investment decision under all the circumstances. (*People v. Butler* (2012) 212 Cal.App.4th 404, 421.)

56

B

Susan asserts there was not sufficient evidence showing her direct involvement with each of the five victims in this case. She also argues there was a lack of evidence to support the jury's verdict on either an aiding and abetting or conspiracy theory. However, as the Attorney General outlines, the evidence in the trial court showed that Susan was an integral part of the investment scheme and, at minimum, aided and abetted her husband's violation of sections 25401 and 25540. Critically, witness testimony established she was present in meetings with all of the victims about the scheme except the Van De Vens and failed to correct the false and misleading statements and omissions made by William, or made such statements and omissions herself.

Specifically, Wightman testified that *both* Susan and William told him he would be a first lien holder on the property. Branch testified that based on a meeting with both Susan and William in their office in La Mesa, she believed that Susan was the one "running the show." She also testified both William and Susan guaranteed the investment. Similarly, Blowers, who met William and Susan together when they presented at his church, testified "it was very obvious that [Susan] was every bit equal to [William], if not more so." Blowers rejected the defense position that Susan was merely a typist for William. When Blowers met with the Avignones in their office, Susan participated in the investment pitch and supported what William told him about the scheme, its safety and the couple's successful record of investing in real estate. Susan never contradicted William.

Lopez's testimony about Susan's involvement echoed that of Branch and Blowers. He described the real estate pitch as given by both William and Susan in their office. Lopez testified *they* told him *they* periodically went to

57

Georgia to check on the properties, that he believed he was investing with both defendants through SABA Financial, and that both explained the terms of the investment to him. Further, Susan was the one who assisted Lopez with his creditors and dealt with the required paperwork to facilitate the investment (as she also did with other victims). Eric Van De Ven did not testify about meeting with Susan to discuss the real estate investment, but his testimony supported an inference that he understood Susan and William were partners in the business. Like the other victims, Van De Ven referred to them and their business dealings collectively. When the quarterly interest payments ceased, Van De Ven initially called Susan, not William. Additionally, Susan was a signatory to at least one of the promissory notes for each victim and endorsed some of the investors' checks. And her business cards held her out to the victims as the business's "Financial Strategist."

This evidence supported the jury's finding that Susan and William were equal partners in the real estate scheme. Even if Susan did not make the same material misrepresentations as William, she was present in meetings in which those misrepresentations were made (e.g. that they were experienced in this type of investment and that this was a safe and guaranteed investment) and she herself omitted to provide the victims with material information about the promissory notes (e.g., that they lacked any experience in such transactions, that they had no independent knowledge about securing first lien positions for the victims, their own financial trouble and use of the victims' investments to pay their personal expenses, and, after the initial investments, that the scheme and had failed and they were using new investments by the victims to make interest payments on earlier investments).

At minimum, the evidence supported a finding by the jury that Susan aided and abetted William's violations of sections 25401 and 25540. Susan, in essence, asks this court to reevaluate the evidence to conclude she was not a participant in this scheme. That is not this court's role. Rather, we must determine whether there was sufficient evidence to support the jury's findings that Susan was liable directly, or as an aider and abettor or coconspirator. This burden is easily met.

C

We also reject Susan's argument there was insufficient evidence to support the jury's findings that the statements and omissions made by the Avignones to their victims were materially misleading. The evidence showed that William and Susan vastly misrepresented the nature of the investment they were selling—representing it as safe and secure, and omitting any information about the risks or their own inexperience with this untested real estate scheme. They further told the victims their investments were secured by the homes in Georgia, which guaranteed the victims' principal could not be lost. These statements were demonstrably false. They also omitted the material information that William and Susan did not know how to secure the first lien positions they were promising and were relying exclusively on the expertise of Mark Evans, a person unknown to the victims.

In addition, the misleading nature of the Avignones' promises became more extreme as time passed. Despite knowing that the scheme was already failing because of their inability to purchase properties that could be rented to Section 8 tenants, they continued to solicit additional investments from the victims. Their false promises and omissions, thus, became more significant as the scheme went on. By the time Blowers made his second investment in 2011, the Avignones were painfully aware that they had lost all of the earlier

59

contributions made by the victims, yet Blowers's testimony was that they disclosed none of this relevant information to him.

As with her arguments about her involvement in the scheme, Susan makes another series of arguments that amount to a request for this court to draw different inferences from the evidence than those drawn by the jury. She argues the statements were not false and misleading because (1) she and William "did not present themselves as experienced financial advisors" or real estate investors; (2) William and Susan sincerely believed the investment would be profitable; (3) the victims did not understand what the term "first lien" meant, so the promise of a first lien was not misleading; and (4) because the promissory notes did not contain any term restricting their use of the victims' funds, William and Susan's failure to disclose that they spent the money on personal expenses was not material. Finally, Susan asserts that because the most important aspect of the investment to her victims was the monthly interest payments, and they received those payments for a period of time, none of the other information was material.

These arguments do not support reversal of the securities fraud convictions. The evidence showed the victims believed William and Susan were experts in providing financial advice and would protect their retirement savings because they held themselves out in this manner. For instance, they repeatedly guaranteed the victims' principal was safe and secured by the property they intended to purchase. To support her assertion that William and Susan were honest about their lack of experience in this type of venture, Susan points to White's testimony that White had only known them to sell insurance, and had never seen them invest in real estate. But White was not a victim of the scheme. Susan also points to Wightman's testimony that he knew William was not experienced in real estate. This testimony, however,

60

does not show that William and Susan's representations that they had the experience and knowledge to manage the real estate scheme were not materially misleading.

Susan's argument that her and William's statements were not materially misleading because they honestly believed the scheme would become profitable was one inference that could be drawn from William's testimony, but this conclusion was rejected by the jury. We are not permitted to reweigh the evidence or reassess William's credibility in the manner Susan suggests. Likewise, the fact that the promissory note did not explicitly restrict the Avignones' use of the funds says nothing of whether their failure to disclose how the money would be used was materially misleading. Again, the interpretation of the evidence advanced by Susan was reasonably rejected by the jury. As the Attorney General responds, Susan's "argument simply does not in any way detract from the false statements or material omissions" made by the Avignones to their victims.

The same goes for Susan's argument that because Eric Van De Ven testified that he did not understand the term "first lien" the Avignones' promise of a first lien was not material. Eric testified he understood that the principal was secured by a property interest. The jury's determination this was a false and materially misleading statement was supported by Van De Ven's testimony irrespective of his understanding of the isolated term "first lien." Likewise, the fact the investors might have prioritized the receipt of monthly payments over the security of their principal investment does not detract from the false and misleading information the Avignones provided about the security and safety of that principal. At most Susan has presented an alternative interpretation of the evidence. She has not shown that insufficient evidence supported the jury's conclusion that the Avignones'

61

statements and omissions were materiality misleading.  Accordingly, we reject Susan's claim of error.

## VI

*The Existence of Two Tests to Determine If an Instrument*

*Is a Security Did Not Violate Susan's Equal Protection Rights*

Susan alone argues that because the existence of a security is determined using two tests—the risk capital and *Howey* tests—her equal protection rights were violated.  This novel argument is without merit.

" ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." '  [Citation.]  'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'  [Citation.]  This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are *similarly situated* for the purposes of the law challenged.' "  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)  "Neither the Fourteenth Amendment of the Constitution of the United States nor the California Constitution [citations] precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different."  (*People v. Guzman* (2005) 35 Cal.4th 577, 591.)

Susan has failed to identify what classification the law has adopted that treats her differently from a similarly situated defendant.  Rather, all defendants charged with securities fraud are subjected to the same legal principles and face the same analysis to determine whether an instrument is a security regulated by the California Securities Law.  Contrary to Susan's assertion, there is no "risk that two similarly situated defendants will obtain

62

differing results based on an arbitrary decision made about which test applies." Instead, in every case the court employs a reasoned analysis to determine if the instrument is properly classified as a security under either test. (See *People v. Syde* (1951) 37 Cal.2d 765, 768 ["The Corporate Securities Law does not contain an all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case."] (*Syde*).) This two-test analysis applies to all defendants equally.

Additionally, even if Susan was treated differently than a defendant who fraudulently sold a security as determined under the risk-capital test, Susan has not identified a suspect classification or the violation of a fundamental right. Even if she were treated differently than other defendants, that treatment would be lawful so long as there is a rational relationship between that differing treatment and a legitimate governmental purpose. As the Attorney General asserts, there is a legitimate purpose in employing the broad definition of securities found in the federal *Howey* test, "to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon." (*Syde, supra*, 37 Cal.2d at p. 768.) Finally, the record shows that Susan was notified from the outset of trial that the prosecution was proceeding under the *Howey* test.

Like the trial court, we reject this non-sequitur argument.

## VII

### *White Collar Loss Enhancement Jury Instruction*

Recasting his argument concerning conspiracy liability, William argues that the jury's true findings on the loss enhancement allegations must be

reversed because the jury instruction allowed the enhancement findings to be based on criminal negligence. William also argues that the instruction was erroneous because theft by false pretenses is not listed in the enhancement statute. Susan joins in these arguments.

The Attorney General responds that the claims are forfeited because William did not object to the instruction on these grounds in the trial court. Further, even if the claims were not waived, they have no merit because theft by false pretenses and securities fraud are proper bases for the enhancement. We agree with the Attorney General on both points.

As discussed, in order to preserve a claim of instructional error for our review, the defense must object on the specific grounds raised on appeal in the trial court. (See *Lang, supra*, 49 Cal.3d at p. 1024.) Failure to do so forfeits the issue. (*Hart, supra*, 20 Cal.4th at p. 622.) Here, William concedes that there was no objection by the defense to the enhancement instruction. Accordingly, any error was forfeited.

Even if we were to assume the argument had not been forfeited, we still would not conclude it requires reversal of the enhancement verdicts. The court instructed the jury with CALCRIM No. 3221, the standard instruction on the aggravated white collar crime enhancement for Penal Code section 186.11, subdivision (a)(1) and (a)(3):

> "If you find a defendant guilty of 2 or more of the crimes charged in Counts 1 through 18, you must then decide whether the People have proved the additional allegation that a defendant engaged in a pattern of related felony conduct that involved the taking or resulted in the loss by another person or entity of more than [$500,000/$100,000].
>
> "To prove this allegation, the People must prove that:

64

"1. The defendant committed two or more related felonies, specifically [g]rand [t]heft and/or [f]raud in connection with offer or sale of a security;

"2. Fraud or embezzlement was a material element of at least two related felonies committed by the defendant;

"3. The related felonies involved a pattern of related felony conduct; AND

"4. The pattern of related felony conduct involved the taking or resulted in the loss by another person or entity [of] more than [$500,000/$100,000].

"A pattern of related felony conduct means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events.

"Related felonies are felonies committed against two or more separate victims, or against the same victim on two or more separate occasions.

"Fraud is a material element of [f]raud in [c]onnection with [the] [o]ffer or [s]ale of a [s]ecurity. Embezzlement may be a material element of [g]rand [t]heft.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has not been proved."

William contends this instruction incorrectly allowed the jury to find the enhancement for theft by false pretenses and securities fraud. In other words, he believes the only losses that can be included are for embezzlement. William's argument that grand theft losses cannot be included appears to be based on the language in the statute that requires the losses to be from "two or more related felonies," a material element which is "fraud or embezzlement." He asserts that because the prosecutor proceeded on

65

theories of theft by false pretenses *and* embezzlement, but Penal Code section 186.11 only mentions "embezzlement," the jury could not include the grand theft charges in the computation amount of the enhancement.

William's reading of the statute is too narrow and not consistent with its language. The statute does not purport to list each crime that is included; rather, it states generally, that the enhancement must be based on two or more felonies, "a material element of which is fraud or embezzlement." (Pen. Code, § 186.11.) Grand theft includes both embezzlement and theft by false pretenses. (*Gonzales, supra*, 2 Cal.5th at p. 865.) Since theft by false pretenses required the jury to find appellants "intentionally deceived a property owner by [a] false or fraudulent representation or pretense," it clearly falls under the category of "fraud" and losses based on the grand theft convictions were proper bases for the enhancements. (CALCRIM No. 1804, see *People v. Martinez* (2017) 10 Cal.App.5th 686, 693 [enhancement based on Corporations Code violations and grand theft and conspiracy]; *People v. Nilsson* (2015) 242 Cal.App.4th 1, 16 [applying enhancement to grand theft]; *People v. Mozes* (2011) 192 Cal.App.4th 1124, 1129 [defendant pled guilty to multiple counts of theft by false pretenses and admitted enhancement based on that charge]; *People v. Frederick* (2006) 142 Cal.App.4th 400, 404 [enhancement based on grand theft and securities fraud counts].)

Finally, in an argument similar to his prior assertion that the conspiracy instruction was erroneous because it allowed the jury to find the defendants liable for securities fraud as conspirators based on mere negligence, William contends the enhancement instruction was flawed because the enhancement also cannot be based on negligent conduct. As discussed, William's interpretation of the criminal negligence language contained in section 25401 is misguided. That provision does not allow for

66

liability based on negligence in the manner he asserts. Rather, the statute regulates knowing conduct. Undoubtedly, securities fraud convictions are proper bases for the enhancements. Further, the enhancement instruction specifically required the jury to find that fraud or embezzlement was a material element of the felonies. Thus, the jury could not logically find the enhancement was based on mere negligent conduct. Accordingly, William's argument fails.

## VIII

### *Jurisdiction Over the Crimes Against the Van De Vens*

William's final contention on appeal, also joined by Susan, is that count 2, the securities fraud charge related to the Van De Vens, must be reversed because the trial court lacked jurisdiction over the transaction, which William argues occurred in Arizona. The Attorney General responds the court properly exercised jurisdiction over the crime because at least some part of the crime was committed in this state.

Before trial, Susan moved to dismiss counts 1 and 2 under Penal Code section 995, asserting the court lacked jurisdiction over her and San Diego was not a proper venue with respect to the Van De Vens because they lived in Arizona at the relevant time. The prosecution opposed the motion, arguing jurisdiction and venue were proper because the Avignones cashed the Van De Vens' check in San Diego, conducted their unlawful operation in San Diego, and because the Avignones caused harm in San Diego as a result of the fraudulent real restate scheme. After argument, the court denied the motion.

At trial, Eric Van De Ven testified he first met William and Susan in his home in Arizona, and shortly after decided to refinance his home on the Avignones' advice. Several years later, William called Van De Ven to tell him about the real estate scheme. William also sent an email about the proposal.

67

The Van De Vens took money from their Midland National life insurance policy and sent a check to the Avignones at their La Mesa office in San Diego. The Avignones then mailed a promissory note from their office to the Van De Vens, who signed the note and returned it to San Diego. According to William, all of the Avignones' transactions with the Van De Vens were over the phone and by mail or fax machine.

California jurisdiction statutes provide territorial jurisdiction when at least some part of a crime is committed within California. (*People v. Brown* (2001) 91 Cal.App.4th 256, 263.) Those liable to punishment in California include "[a]ll persons who commit, in whole or in part, any crime within this state." (Pen. Code, § 27, subd. (a)(1).) Further, whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state. (Pen. Code, § 778a, subd. (a).) Accordingly, Penal Code section 778a provides territorial jurisdiction in California over an offense if a defendant "with the requisite intent, does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense." (*People v. Betts* (2005) 34 Cal.4th 1039, 1047 (*Betts*).)

In reviewing an issue of territorial jurisdiction, an appellate court must uphold a trial court's factual determinations if supported by substantial evidence. The trial court's legal determinations are reviewed de novo. (*Betts, supra*, 34 Cal.4th at p. 1055.)

The evidence in this case showed that all of the Avignones' actions related to count 2 occurred in San Diego. William contacted Eric Van De Ven from his office in La Mesa and all of their discussions about the investment in

the real estate scheme occurred while the Avignones were in this state. Further, the promissory note itself states explicitly that it was entered into in California. This conduct in California supported the court's territorial jurisdiction over count 2.[11] (See *People v. Anderson* (1961) 55 Cal.2d 655, 661–662 [holding jurisdiction properly exercised over defendants who initiated plan to steal from victims in California, even though the final consummation was in Nevada].)

DISPOSITION

The judgments are affirmed.


McCONNELL, P. J.

WE CONCUR:


DATO, J.


DO, J.

---

[11]    William points to the fact that he and Susan initially met with the Van De Vens in Arizona. This meeting, however, occurred several years before the crimes at issue in this case occurred. Thus, that fact is not at all dispositive of the jurisdictional question William raises.

69